This is Watkins v. Davis, and we'll give the courtroom a few minutes to settle down before we begin those arguments. Just one moment. All right, we're going to go ahead with Ms. Watkins' case, and we'll hear first from Mr. Waymire. Mr. Waymire Good morning, and may it please the court, I'm Jason Waymire here on behalf of defendants Davis and Faulkner. They were sued in the district court on Fourth Amendment claims. They filed a summary judgment, and some judgment was denied. So we are here on denial of qualified immunity, and we submit that the district court should be reversed. I take it the court is extremely familiar with the facts of this case? Ms. Watkins I think we're all pretty well versed. Mr. Waymire So I'm going to go to the claims involved in the case. The claims are for personal detention, for excessive force, and a property damage claim. The basic facts that matter here are on video. There are three videos that are particularly important, two body cam videos, and one which is an over-elevated surveillance video. So what that video shows is Ms. Watkins driving, accelerating, and about to hit Officer Davis. Ms. Watkins Right, but there's a lot before that, before you get to that point. I'm sorry. Go ahead. I mean, before you get to that point, there's a woman who is doing her job and putting things in her car in order to fulfill her job to get something to a patient, a COVID patient. She's in an area where there's no other individuals, and it's dark. And people approach her. She has no idea who they are, and she's in her car, and she proceeds. So, I mean, how is this not a question for a jury to be making as to whether or not the officer got in front of the car, and she was not aiming at him? So I need to direct you to the Mendez case from the Supreme Court, which basically rejects what's called the provocation rule. The quote rule, which isn't really a rule, is that police officer conduct before the incident that allegedly triggers the incident can matter to the resulting Fourth Amendment claim, the excessive force claim. The Supreme Court says, no, that doesn't matter. What matters to the excessive force claim is what is going on, what are the circumstances when the officer makes the decision to pull that trigger in this particular case. So Mendez involved officers who go into a place where they don't have a warrant to go into. They go into a house, basically. A person grabs a gun, and the officers shoot at the person and hit the person with the gun. It turns out to be a BB gun. The Ninth Circuit said, well, you can expect when you illegally barge into somebody's house that they might grab a gun. And so the officers triggered that. The Supreme Court says, no, that's not the way it works. The way it works is if somebody's got a gun and they're pointing it at you, an officer can fire at them. So if there was some independent Fourth Amendment violation before that, well, we analyze those separately. But Mendez says that the point that matters for an excessive force claim is when the officer decides to pull that trigger, what's going on. Which is why, initially, I went to, there's a car accelerating at Officer Davis. Wait, we can't, we really can't look at that in isolation. And even if you could look at that in isolation, the district court found, in viewing the video, that there is a material question of fact about whether Davis was actually even in the path when Watkins tried to get out of the situation, which the officers did cause. I mean, you know, we're talking about a situation where the officers, as my colleague has explained, went to a dark and desolate place. They didn't even have any kind of reasonable suspicion. They conceded they had no reasonable suspicion of her. They approached her and snuck up on her. In their words, they were trying to sneak up on her. They were, it was completely dark. They didn't use their flashlights. When they finally turned their flashlights on, it was at the end of a gun pointing at her. I mean, of course she drove off. She thought she was being attacked. Why isn't she allowed to drive off, and why isn't it a jury question, based on the video, as to whether or not she aimed for, and a reasonable officer would believe, that she aimed for Davis and tried to hit him? I have to go to the video, particularly the overhead video, and I would kind of disagree with the factual characterization, some of the things that you're saying, and the district court said. First of all, they're not sneaking up on anybody. They're just walking down a driveway. They have the right to do that. Okay, did they agree to keep their lights off? No, they don't have to agree to keep their lights on. Did they decide, did they make an affirmative decision they were going to turn off their lights? No, they had their lights on. They didn't turn them on. One of the officers had his lights off. The other one didn't turn it on until the gun was pointed. By lights, you mean flashlights, I take it. You don't mean blue lights on a car. Right. They didn't have their blue lights on the car on. That's right. Right. So flashlights, you can see flashlights in the video before the car ever gets to the gate. Does that answer? But they didn't identify themselves as police. I think that's part of the question. Right. They just started shooting at her. I mean, you could have a flashlight, but you could be someone who's trying to rob me with a flashlight. So there's a big difference between an officer coming and identifying themselves as an officer. If I see a blue light behind me, I think it's an officer. Well, these officers were in uniform. They can't control the darkness. They can't control the dark uniforms. But have you looked at the video? Because if you look at the video, you can't tell that they're in uniform. I looked at the videos. I couldn't see that they were in uniform. Well, Ms. Watkins had headlights that shined directly on the officer. Okay, but you've just said that they also had flashlights, which they did at the point when they were shooting, when they were aiming the gun at her. And they're aiming the light in her eyes. I mean, how is she supposed to see, especially on the video? Why isn't it? I mean, even if we assume that she could see them with the lights on, that's a jury question. I mean, I've just told you, and you haven't pushed back on the idea, that when you look at the video itself, you can't tell that they're in uniform. You can tell that they are wearing something dark from the overhead video. Okay, but. But they have police insignia on. And you see, did you think you could see that they're in police uniform when they're on the video? And I thought Officer Davis was also wearing a black face mask and black gloves. He was. It was cold. I understand. I know. It's January and we're in Atlanta. It's cold. So I suppose I should answer all that by saying this is from the officer's perspective. That's what the Fourth Amendment considers. These officers are walking down a driveway. They have every right to walk down. They're investigating something. They have a right to do that. They're wearing police uniforms. There's headlights on them. And then suddenly a vehicle comes barreling at them, accelerating, and it doesn't matter. So. I'm sorry. It's okay. Here's the question, though. Why isn't it a jury question as to whether or not a reasonable officer would have believed that the car was aiming for them? Why isn't that a jury question? I mean, on the video itself, you can't really tell where the car is in relation to Davis. And Davis steps out in front of the car at some point. Why isn't that a. Okay. Let's explain. The video shows this. Davis, before the car starts to accelerate through the gate, yes, he steps from right to left. He does. He steps in front of a moving vehicle. Does the video show that? The vehicle is probably 45 feet away when he makes that step. But the vehicle is rolling up to the gate. This officer steps in front of a moving vehicle. The officer is stepping into the middle of a street, and the vehicle, yes, is moving from the building area up to the gate area. Yeah. Now, the officer has every right to do that. He's got the right of way just the same as she does. But regardless, whether he's an officer or not, she does not reasonably perceive, at least from their perspective, a deadly force threat that she can then drive over somebody. Yeah. She says in her deposition, so we've got some facts in dispute in this record, that she didn't know these were police officers. Once she learned that these were police officers, she stopped. And so why can't a jury look at the video and consider her testimony at the trial and believe her? Because all that matters is the officers and what they understand, what they perceive. They don't know what in the world is going on in her mind. All they know is there's a vehicle coming at me about to kill me. Okay. So you began your argument by saying we only look at what happened when they started chasing her. But don't they have to establish that there's probable cause that a crime has been committed first? Isn't that a part of the analysis? The question for deadly force is whether there's probable cause that there's an imminent threat of deadly harm to the officer. And absolutely there was. The case law says that all day long. And we don't take into consideration whether there was probable cause that a crime had been committed by Ms. Watkins? That's not the technical inquiry. But there is a crime being committed. It's aggravated assault and reckless endangerment. Yeah. Okay. But again, she didn't know. I mean, it doesn't matter. I'm sorry? So we don't look to whether there's probable cause that there was a burglary committed by this person that they're chasing? Not in this particular. Not to fire at a vehicle. Not to fire at an oncoming vehicle. I mean, if there was a burglary, that could matter to some extent, but that's really not the critical thing here. The critical question is, is there an imminent threat of deadly harm to that officer at the moment he fires? And absolutely there was. You can watch the video, and that's what it shows. You can show he dropped his flashlight. She rolled right over the flashlight. Sorry. She rolled right over the flashlight. She would have hit him and killed or maimed him had he stayed where he was.  All right. Thank you. All right. Mr. Upshaw. Yes. We'll take care of that. My apologies. That's okay. Good morning, Congress. May it please the Court. My name is Christopher Upshaw. I represent Tammy Watkins, in this case, the appellee. My adversary, opposing counsel, is correct when he states over and over that the analysis, in large part, is to be taken from the standpoint of the officer. However, and Your Honors picked up on this, of course, immediately and began commentating, the perspective of a reasonable officer. And reasonableness, as we know, is a question of fact. That is a question that can and should be resolved by a jury in this case. Your Honors, Judge Totenberg's order denying summary judgment, I believe, is very well-written, exhaustively researched, and I believe it's accurate and should be upheld in every respect. You know, the appellants try to paint a picture of a split-second case, and we see that phrase, split-second, all the time in these 1983 cases. I submit, Your Honors, this is anything but a split-second case. And as Your Honor indicated a moment ago, you know, we don't start at necessarily the shots or the seconds right before that. We start at all the intentional actions that these officers took, and even that they admitted to taking in their depositions and as the record establishes, all throughout the lead-up to this. So the body camera from Officer Davis is eight and a half, nine minutes long until we get to the shooting part. He admits, and they all do, they took every affirmative act to conceal not only their mere presence, but also who they were. There were no lights on, no sirens, no flashlights until seconds, split seconds, before the shooting. And, you know, ultimately, we come to this 60-second crescendo where they begin to approach Ms. Watkins in the driveway, and that's where things, of course, went so very awry. Ultimately, we have a situation where these officers try to take advantage, and this court has used this language before, they try to avail themselves of qualified immunity by taking advantage of their own objectively unreasonable actions, which create the very risk that they then use to justify the use of force. And, you know, we submit that that's not appropriate, and the court, the district court picked up on that as well and commented on it at great length. And so that's why, you know, I feel very strongly that the district court was correct, that this use of force was frankly outrageous, given all the conduct that led up to the shooting, all of which conduct was preventable. That's what's so challenging and troubling about this case, is that, you know, think of a Swiss cheese model of a disaster. Any one step that these officers could have taken, even if just one of those steps had been reasonable, and we would not be here. But regrettably, that didn't happen, and so that's why I'm asking the court to uphold the district court's ruling. You know, with respect to the use of force, again, all these questions come back to and turn on the reasonableness of, the objective reasonableness of these officers. A jury can and should look at these facts and say, and look, you know, these officers would still be allowed to make a qualified immunity defense at trial, but I don't believe that it's appropriate under the circumstances to, you know, to adjudicate that issue here, and I think Judge Totenberg correctly decided that, and that this case should be permitted to proceed to a jury. Thank you, counsel. Mr. Wehmeyer, you've got five more minutes. Oh, I'm so sorry. If I could have just one moment to look. All right, Mr. Upshaw again, and then we'll get back to you, Mr. Wehmeyer. I may be done, so if I could just have a moment to make sure. Sure. I would just emphasize as well, and I talk about this a lot in my brief, and Judge Totenberg does as well in her order, every case that the appellants cite in support of the use of force is extremely distinguishable, the biggest factors, of course, being these things are either in the daytime, these officers are plainly identifiable, have identified themselves, have issued warnings, you know, something loud, something outspoken, and I won't belabor the point. I think it all speaks for itself in the record of this case, but I did want to mention that as well. All right, thank you, counsel.  All right, sorry I jumped the gun there, Mr. Wehmeyer. We'll get back to you now. Five minutes. Five minutes. Let me ask you this question, counsel. First of all, the 9-11 caller described a totally different vehicle than Botkin's car, number one. And number two, she was at 30 Bellamy Drive and not 11 Bellamy Drive. That was identified in the 9-11 call. How does that factor into the reasonableness analysis when we look at whether or not a reasonable officer would believe that a crime had been committed and that she was a suspect in that crime? Here's what I think is going to answer your question. Analytically, I have to reiterate what I've said before, that so far as pulling a trigger on a gun, it matters what's happening at that particular moment. But I'm going to answer your question. So it is a completely different vehicle. They got called about a black truck being broken into. And this is a different location. Now, this is an office park, and it's deserted, largely. It's a Saturday night with nobody else out there except car burglars and Ms. Watkins. So kind of strange circumstances that somebody would be out there on a cold Saturday night. Different location, yes, this is what police do. Officers, you know, they investigate things that look suspicious, that look strange. What probably would have happened had Ms. Watkins just stayed put or stopped would be a walk and talk sort of thing and, you know, a citizen police encounter where they figure out, oh, Ms. Watkins, you know, you're just here for work. Did they identify themselves as police officers before they started shooting and yelled freeze? Nobody said police. Okay. They had police uniforms on, which the case law says. It says I didn't know they were police officers. As soon as it was determined that I thought they were police officers, I stopped. Right? That's what she said. Now, they don't know what's going on in her mind. Yeah, and a jury could believe her if she testified to that. And the jury could listen to that and take a look at the video and say, well, the video corroborates that. Yes, but for the Fourth Amendment, it doesn't matter what's going on in Ms. Watkins' mind. I want to point you to the case of Powell v. Snook, which is a case I handled. It's a Henry County officer case, and it's a case where officers were dispatched to the Powell residence. They weren't doing anything wrong. It was the wrong residence. They were dispatched there. Same dark uniforms. It was even darker. It was pitch black. The person who lives there reacts to these kind of inky-looking people out in his yard. He walks out with a gun. There's no police announcement, according to the plaintiff. The gun starts to raise. Mr. Powell and Mr. Powell is shot. This court says that the officer is allowed to fire, even with no police announcement, even when it's completely dark, even when he's wearing exactly the same uniform that these officers were wearing, because he's facing an imminent deadly force. All right. Let me take you to a different question, though. So let's just assume, well, here's the problem that I see. The district court found, and we'll look at it de novo, but I think the district court had good reason to find, that there was a material question of fact as to whether or not Ms. Watkins, a reasonable officer would believe that Ms. Watkins was aiming for Mr. Davis. And on top of that, we have the testimony of Ms. Harris saying, the other officer who's not actually involved in the confrontation but who Ms. Watkins encounters later, saying that she didn't think that Ms. Watkins was aiming for Officer Davis. Why isn't that a jury question? I mean, that's really what this comes down to, because if that's a jury question, then the district court decided this correctly. It's not a jury question because you can watch the video and see exactly what happened. The e-mail officer is really easy because her subjective belief after the fact really doesn't matter to anybody. Okay, but let me ask you, because you're relying exclusively on the video then for us to be able to conclude that a reasonable officer would think that Ms. Watkins was gunning for him, right? That's what you're relying on. There's no other evidence than that, right? There are three videos that show that. All right. Well, if we look at the video, I mean, the district court found that it wasn't plain as day. I mean, that's what the district court says in the decision. Do you agree? Yes. I think the judge must have been looking at a different video. I've looked at the video as well, and it looked to me like, you know, it was a jury question as to whether or not a reasonable officer could believe that. Why isn't it a jury question? I mean, I guess the question is, we have to be satisfied that the video shows that a reasonable officer would believe or could believe that Ms. Watkins was gunning for him, right? That's really what this boils down to. Well, for aggravated assault, you don't have to know the particular intent of the person. You just have to know what they're doing and that you're placed in a reasonable fear of an imminent violent injury. Right. And reckless endangerment, it's even lower. But I'm just saying that she was going to hit him, right? That's what you have to – it all comes down to whether or not the video shows that incontrovertibly, right? That's what it comes down to. I don't think it's incontrovertibly. It doesn't have to show that. I mean, the case law has various cases where officers are to the side of the vehicle and they fire. For example, the Baxter case that I just cited, it's recently decided. The officer's to the side of the vehicle. All they've got to believe is that they're an imminent deadly force threat, right? That the vehicle can swerve and hit me and might. That's all it takes.  But here – No, it's okay. You can finish your thought. Here, what you've got is a video with an officer standing, a vehicle accelerating at him. If you watch, he drops a flashlight and then springs out of the way. The car goes right over the top of the flashlight, right where he was standing. So if you're going to say that the video doesn't show that she would have hit him, I just have to disagree with that. You're watching a – Let me ask you one more question because I want to make sure I understand what your argument is. Are you arguing that an officer can use deadly force even in the absence of probable cause that the fleeing felon had engaged in criminal conduct? The rule that I'm relying upon is that an officer can use deadly force when that officer is faced with a deadly force threat. Even in the absence of probable cause that the person has engaged in criminal conduct? Well, not exactly because when the person is posing an imminent deadly force threat to the officer and there's arguable probable cause for that, that is per se criminal conduct.  And that's what's going on. Let me ask you something just out of curiosity. Have you all – do you think that mediation would help you here to find a solution to this case? I mean, it seems like you've got some serious problems in your case. I've filed things before that used the term mediation and the clerk's office had a problem with that. So I'll say, though, in answer to your question that we were ordered to mediation. We did mediation and that was unfruitful. All right. Well, sometimes it becomes more fruitful after oral argument. So I'm asking you whether you think it would be worth trying to mediate it again. Based on what happened at the other mediation, I rather doubt it. If the court wants to order that, then hey, we'll go. All right. Thank you very much. We'll be in recess until tomorrow.